ALMON, Justice.
James Champagne filed an action against First Southern Federal Savings and Loan Association (“First Southern”),[1] Andrew Grady Dean, and David Burdette, alleging conversion of a checking account and negligence with respect to the alleged conversion of the checking account. The jury returned a $75,000 verdict against Burdette and First Southern on those claims. The trial court entered judgment on the verdict and denied First Southern and Burdette’s motion for a judgment notwithstanding the verdict.
Dean owned a computer software counseling company named International Systems, Inc. Through International Systems, Dean and Champagne knew Richard Holla-day. International Systems filed for bankruptcy, and Dean, Champagne, and Holla-day decided to form a new corporation, Worldcom International, Inc. (“World-corn”), which was, to some degree, an outgrowth or partial continuation of International Systems.
On September 27, 1985, Champagne opened an interest-bearing checking account at First Southern. Champagne signed a “master account card” that gave the name of the account as “James E. *473 Champagne, Jr., DBA Worldcom.” He deposited $5,000, and the account was numbered 04-70328312 (“Account 312”). The bank gave Champagne checks for Account 312 that read “Mr. James E. Champagne, D/B/A Worldcom”; however, Champagne had the checks changed to read “Worldcom International, Inc.”
Worldcom was incorporated in Delaware on October 25, 1985. The certificate of incorporation named Champagne and Hol-laday as directors of the corporation; Dean was not mentioned, apparently because he was involved with the bankruptcy proceedings of International Systems.
Champagne inquired at First Southern about procuring a line of credit for World-Com. He was referred to David Burdette, a commercial lending officer, and he met with Burdette on or about October 31, 1985. At this meeting Champagne gave Burdette a corporate resolution, to which we shall sometimes refer as “the first resolution.” The resolution stated that it related to “Worldcom International, Inc.” and to “Account Number 04-70328312.” The resolution listed Champagne as president, secretary, and treasurer of the corporation, and Holladay as vice president. It authorized Champagne to write checks and to borrow money on Worldcom’s behalf and was signed by Champagne as secretary of the corporation and by Holladay as vice president. The resolution also contained this language:
“RESOLVED: That the Secretary or any other officer of this corporation be, and hereby is, authorized to certify to Bank the names of the present officers of this corporation and other persons authorized to sign for it and the offices respectively held by them, together with specimens of their signatures, and in case of any change of any holder of any such office or holders of any such offices, the fact of such change and the names of any new officers and the offices respectively held by them, together with specimens of their signatures; and Bank be, and hereby is authorized to honor any instrument signed by any new officer or officers in respect of whom it has received any such certificate or certificates with the same force and effect as if said officer or said officers were named in the foregoing resolutions in the place of any person or persons with the same title or titles. “RESOLVED: That Bank be promptly notified in writing by the Secretary or any other officer of this corporation of any change in these resolutions, such notice to consist of new resolutions in the form hereof given to each office of Bank in which any account of this corporation may be maintained, and that until it has actually received such notice in writing it is authorized to act in pursuance of these resolutions, and that until it has actually so received such notice it shall be indemnified and saved harmless from any loss suffered or liability incurred by it in continuing to act in pursuance of these resolutions, even though these resolutions may have been changed.”
The account was used for business purposes. Other than the initial $5,000 deposited by Champagne, all deposits into the account came from two sources, loans made by First Southern to Worldcom and the proceeds of accounts receivable of Worldcom. All the checks drawn on Account 312 were written for the business expenses and costs of operations of World-Com, such as rent, salaries, and the like.
Dean worked with Champagne, attempting to make Worldcom profitable; Dean’s wife served as receptionist and bookkeeper of Worldcom. Champagne gave Burdette his business card, which had on it this handwritten statement: “Andy Dean at the office can fill him in on anything.” In February 1986, when a check in the amount of $11,000 drawn on Account 312 caused an overdraft in that account, Dean made arrangements with Burdette to finance the amount necessary to cover the overdraft, though Burdette required Champagne to “go by and sign” the loan, because of the first corporate resolution.
Holladay did not provide the financing that Champagne and Dean anticipated as quickly as they expected it. The initial $5,000 deposit was depleted to a balance of $166.52 by November 1, 1985, and a $10,- *474 000 loan extended by First Southern provided the funding for the account between November 4, 1985, and December 2, 1985. In February 1986, Holladay began making arrangements to provide money to World-Com. On March 1, Champagne and Holla-day held a Worldcom board meeting by telephone. The two discussed Worldcom’s “cash flow shortage” and the fact that Worldcom anticipated a “new investment” shortly; they also discussed the fact that Dean could shortly become an officer of Worldcom, as soon as Dean’s lawyer told him “it was safe to do so.”
Ten days later, on March 11, 1986, Holla-day, by depositing $100,000 with First Southern, obtained a savings certificate payable to his order for that amount. The next day, March 12, Worldcom was overdrawn again, so Holladay pledged the savings certificate to secure “any and all” loans made by First Southern to Worldcom, and he and Dean submitted two documents to Burdette. The first document was a letter written on Worldcom stationery, addressed to Holladay and signed by Dean as “President.” The letter stated that on March 11, 1986, the Worldcom board of directors met and elected Dean president and Holladay vice president, secretary, and treasurer. The letter further stated that Dean and Holladay each owned 50% of Worldcom and that they were the only members of the board of directors.
The other document presented to Bur-dette was a new corporate resolution, to which we shall refer as “the second resolution.” That second resolution was identical in form to the first resolution; it also stated on its front page that it related to a corporation named “Worldcom International, Inc.” and to “Account Number 04-70328312.” The second resolution was also embossed with Worldcom’s corporate seal and was signed by Holladay, who had been listed as an officer in the first resolution. The second resolution listed Dean as president, authorizing him to write checks and borrow money, and listed Holladay as vice president, secretary, and treasurer.
Also on March 12, Worldcom borrowed an additional $10,000 from First Southern. From the proceeds of that loan, $5,539 was deposited into Account 312 on March 14. The remainder of the proceeds was deposited into Account 66-36610370 (“Account 370”), a new account established on March 14 at First Southern in the name of “Worldcom International, Inc.”
On March 12-13, Dean wrote six checks on Account 312, and the last of those checks cleared on March 19. On March 20, the remainder of the funds in Account 312 was transferred to Account 370, and Account 312 was closed.
Around March 17, Champagne contacted Burdette and objected to the closing of Account 312. Burdette met with Champagne, who told Burdette that the second resolution was invalid. Burdette sought advice of legal counsel, who advised him to accept the second resolution as facially valid but to require Dean and Holladay to provide evidence concerning the validity of the second resolution. Burdette followed the advice of counsel, and when Holladay and Dean did not provide the evidence requested, First Southern closed Account 370 and issued a check for the balance of the account, made payable to Worldcom.
Champagne filed this action on November 21, 1986. The complaint alleged that Burdette and First Southern had converted Account 312; that Burdette and First Southern had been negligent in respect to the alleged conversion; and that Dean had converted Account 312. Dean was dismissed as a defendant during the trial. The jury returned a $75,000 general verdict on Champagne’s negligence and conversion claims, and the trial court entered judgment on the verdict. The trial court denied First Southern and Burdette’s motion for judgment notwithstanding the verdict, or, in the alternative, for a new trial.
First Southern argues that the corporate resolutions afford an absolute defense to any liability in either negligence or conversion.
The first resolution stated:
“That the Secretary or any other officer of the corporation ... is authorized to certify to Bank the names of the present officers of this corporation and other per *475 sons authorized to sign for it ... and in ease of any change of any holder of any such office or holders of such offices, the fact of such change and the names of any new officers and the offices respectively held by them ...; and Bank [is] authorized to honor any instrument signed by any new officer in respect of whom it has received any such certificate or certificates with the same force and effect as if said officers were named in the foregoing resolutions.”
(Emphasis added.) That paragraph was followed by language requiring that the Bank be “promptly notified in writing by the Secretary or any other officer of this corporation of any change in these resolutions” and that such notice shall “consist of new resolutions in the form hereof.” The first resolution listed Holladay as vice president, and Holladay signed it.
The second resolution precisely followed the procedure set out in the first corporate resolution for notifying the bank of changes in relation to Account 312. Significantly, Holladay, who signed the first resolution and who was listed therein as vice president of WorldCom, also signed the second resolution; as vice president, Holladay obviously qualified as “any other officer,” who by the terms of the first resolution had the authority to notify the bank of changes in Worldcom’s corporate structure.
When Champagne challenged the second resolution, Burdette sought legal advice. Acting on the advice of counsel, First Southern continued to honor the second resolution, though it also asked Holladay to present evidence concerning the corporate authority for the second resolution. First Southern argues that Bank of the Southeast v. Koslin, 380 So.2d 826 (Ala.1980) (opinion of Maddox, J., with three Justices concurring and the Chief Justice concurring in the result), indicates that First Southern properly declined to disregard the facially valid corporate resolution when Champagne claimed that the resolution was not controlling. In Koslin, supra, the Bank of the Southeast filed an action against the directors and shareholders of Wilkline Industries, Inc., each of whom was a guarantor of Wilkline’s debt to the bank. The bank claimed the guarantors owed $39,000 for overdrafts in Wilkline’s account. The guarantors denied liability on the ground that the Bank had improperly honored checks containing only one signature, in direct violation of a corporate resolution on file with the bank that required at least two signatures on Wilkline’s checks. The trial court granted the guarantors’ motion for summary judgment. Affirming the judgment of the trial court, the opinion in Koslin states:
“It is a general rule that a bank may not honor checks on a corporation’s checking account which do not fully comply with a corporate resolution requiring checks to be signed by a certain number of individuals. Movie Films, Inc. v. First Security Bank of Utah, N. A., 22 Utah 2d 1, 447 P.2d 38 (1968); Maley v. Eastside Bank of Chicago, 234 F.Supp. 395 (N.D. Ill.1964). Furthermore, a bank is not entitled to rely on representations of a corporate officer which are in direct conflict with the provisions of a corporate resolution specifying the mode and manner of paying corporate checks. Rudisill Soil Pipe Co. v. First National Bank of Anniston, 224 Ala. 436, 140 So. 569 (1932).”
Id. at 830. (Emphasis added.) For a similar holding, see D & G Equipment Co. v. First National Bank of Greencastle, Pa., 764 F.2d 950 (3rd Cir.1985).
Considering the holding in Koslin and the factual background at the time Champagne claims the negligence or the conversion occurred, First Southern and Burdette faced a dilemma. Under Koslin’s holding, First Southern was not entitled to rely on Champagne’s assertion that the second resolution was invalid; from the holding in Koslin, First Southern might have reasonably concluded that, had it relied on Champagne’s assertions and had those assertions proved to be unfounded, then it might be liable to WorldCom, as well as risk losing any assets it had given to Champagne on the basis of his assertions.
The factual situation further complicated First Southern and Burdette’s dilemma. Dean and Holladay were no strangers to *476 Worldcom. Holladay was named as a director in the certificate of incorporation and as vice president in the first corporate resolution; Dean had been mentioned as an investor since the first meeting with Bur-dette; D.ean and his wife were active in the administration and operations of World-Com; Champagne had advised Burdette that Dean could “fill him in on anything”; and Dean had assisted in procuring an $11,-000 loan for Worldcom in February, the month prior to the events made the basis of the negligence and conversion claims. Bur-dette had been furnished not only the second corporate resolution bearing the official corporate seal, but also the letter from Dean to Holladay on Worldcom stationery concerning the ownership and management of the corporation. Furthermore, Holla-day, a director and officer of Worldcom, had just pledged $100,000 to secure the debts of Worldcom. Why would Holladay have pledged $100,000 of his personal money against the debts of the corporation unless he had a large interest in the corporation?
Because First Southern handled the accounts exactly as it should have done under the second resolution, and because the second resolution followed the requirements of the first resolution for modifying the manner in which the account was to be handled and was regular on its face, First Southern cannot be held liable either in negligence or in conversion. Because the facts conclusively showed that all the parties treated Account 312 as a Worldcom corporate account, First Southern’s duty in managing that account was to abide by Worldcom’s corporate resolutions concerning the account. It did not breach that duty, and therefore cannot be liable in negligence. T G & Y Stores v. Atchley, 414 So.2d 912 (Ala.1982). Furthermore, because it complied with the corporate resolutions, it exercised no wrongful dominion over the account and therefore cannot be liable for conversion. Empiregas, Inc. of Gadsden v. Geary, 431 So.2d 1258, 1260-61 (Ala.1983).
The judgment is due to be reversed, and a judgment for First Southern and Bur-dette is hereby rendered.
REVERSED AND JUDGMENT RENDERED.
MADDOX, ADAMS, STEAGALL and KENNEDY, JJ., concur.

. First Southern has now changed its name to Altus Bank, but we use the name "First Southern” to be consistent with the prior proceedings.